892 So.2d 161 (2005)
STATE of Louisiana, Appellee
v.
Chris THOMAS a/k/a Chris Banks, Appellant.
No. 39,194-KA.
Court of Appeal of Louisiana, Second Circuit.
January 26, 2005.
*162 James Edward Beal, Jonesboro, for Appellant.
Terry R. Reeves, District Attorney, James E. Lewis, Assistant District Attorney, for Appellee.
Before STEWART, GASKINS and LOLLEY, JJ.
LOLLEY, J.
This criminal appeal arises from the Eighth Judicial District Court, Parish of Winn, State of Louisiana. The defendant, Chris Thomas, a/k/a Chris Banks ("Thomas") was found guilty in a jury trial of second-degree murder pursuant to La. R.S. 14:30.1 and attempted second-degree murder pursuant to La. R.S. 14:27. He was sentenced to life imprisonment for the second-degree murder conviction and to a 40-year hard labor term for the attempted *163 second-degree murder conviction. We affirm Thomas' sentences and convictions and order the sentences to run concurrently.

FACTS
On the afternoon of April 16, 2002, Tenika Boyd ("Boyd") was braiding Thomas' hair in the doorway of her apartment in Winnfield, Louisiana. Timothy Bonner ("Bonner") was sitting with them. Dondi Collins ("Collins"), one of the victims, was sitting on the steps of an apartment nearby with two of his cousins. When Collins' girlfriend, Demetrice Williams[1] ("Williams"), also a victim, walked by, Bonner said something to her and Thomas made a hand gesture. Collins saw the incident, became angry, and came toward Thomas using profanity. Boyd told Collins to go away because her children were in the apartment.
Collins and his two friends, Brandon King ("King") and Darrius Gilbert ("Gilbert"), left the area and walked to a store. However, they returned and Collins confronted Thomas again when Thomas was attempting to get into his vehicle. Collins jerked a cigarette out of Thomas' mouth. Witnesses testified there still was no physical fight between Collins and Thomas, only intense arguing. King testified that Thomas was saying "Ya'll better get ya'll cousin before a n____go to jail for life."
At this point King shoved Bonner, but according to testimony at trial, Gilbert's "Aunt Lynn" (Ms. Leanne King) intervened by pulling Collins away from Thomas and broke up the altercation. Collins, King and Gilbert left the area.
Soon after Collins left the area, he saw Thomas' girlfriend, LaTonya Smith ("LaTonya"), and told her that she needed to check up on her boyfriend. LaTonya's brother, Charles Smith ("Smith"), came down the stairs and saw Collins talking to his sister. He told Collins not to bother his sister or he would "whip hisa  ." Collins walked off and Smith told Collins he would kill him. At around 8:00 p.m. Thomas told Boyd, "Watch this. I'm going to jail tonight."
Later that evening Collins came back to the apartment complex. He walked past Smith and Thomas. Smith threw a beer can at Collins. Collins returned and fought with Smith. Collins had Smith on the ground when bystanders stopped the fight. Collins went into Williams' apartment.
Soon after the fight, Thomas and Smith went to a car and returned to the area. Kendrick Morgan, a bystander, saw that Thomas had a gun and he yelled out, "Hey, this boy got the baby," in an attempt to stop Thomas.
Smith kicked open the door of Williams' apartment and Collins was attempting to close it when Thomas shot through the door. Collins was hit in the head and collapsed behind the door. Thomas then looked at Williams and shot her in the chest.
Smith, Thomas and Bonner went to the car and left with the headlights off. According to Bonner, as they drove off, Thomas stated, "I f____up."
When officials arrived, Collins was dead, and Williams was taken to the emergency room. She survived the shooting, but the bullet remains lodged two inches from her heart.
A jury convicted Thomas of second-degree murder and attempted second-degree murder. He was sentenced to life for the first count and 40 years for the second count. He appeals both the convictions and sentences.

*164 DISCUSSION
On appeal, Thomas raises three assignments of error. In the first assignment of error, Thomas contends the trial court erred in overruling his objections to several inculpatory statements attributed to him, of which he was not provided notice prior to trial. Thomas argues that the state failed to give notice that it planned to use four oral inculpatory statements and that the trial court erred in allowing the admission of these statements. Thomas contends he was prejudiced by not knowing the state had this evidence, because he rejected a plea offer of manslaughter which would have resulted in a less than lifetime sentence.
Louisiana C. Cr. P. art. 716(B) in pertinent part states that:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.
As stated, Thomas objects to the trial court's admission of four oral statements he allegedly made to witnesses on the day of the shooting. The record shows that Thomas filed a motion and the trial court ordered that the state "inform the defendant of the existence, but not the contents, of any oral statements, or confessions of any nature made by the defendant which the District Attorney intends to offer into evidence at the trial of this prosecution, with the information as to when, where and to whom such oral statements were made." (Emphasis added).
During trial, Thomas' defense counsel objected after testimony from one of the victim's cousins revealed that Thomas had made statements that the state had not provided to the defense prior to the trial. The following colloquy took place before the objection was made:
Q. Why'd you think that was Dondi that was shot?
A. Cause what was said.
Q. What was said that made you think that? By who?
A. By Chris and Charles.
Q. Okay, Charles said "I'm gonna kill you" and then the argument...
A. He said "I kill you."[2]
Q. Okay. Was Chris Thomas or Timothy Bonner still at the apartment complex when you got there after the shoot?
A. I don't know.
BY MR. LEWIS:
Okay. Please answer any question that uh Mr. Hunter has for you.
BY MR. HUNTER:
Sidebar Your Honor
* * *
... the state has called Mr. Brandon King and obviously has uh statements that uh ... uh we think are discoverable and that uh would have allowed us to prepare an adequate defense uh to some of the statements that he made regarding Dondi Collins....
The state replied to the objection that it had no obligation to tell Thomas who its witnesses were, and "I don't have to tell `em what my witnesses are going to say." The state also informed the court that it had granted open discovery, there were no *165 written statements, and it had learned of the statements through interviewing the witnesses. The trial court simply ruled that it was not taking any action at the time. Thomas' trial counsel asked that the objection be noted for the record.
Thomas also states that another objection was made; however, the record shows that Thomas' counsel did not follow through with the objection. An "objection" was made after the state asked its witness, Gilbert, to explain what the defendant's statement "let me show you how we do it in California" meant. The state continued its questioning, but Thomas' trial counsel did not pursue the objection further. The record shows this statement was also made prior to the shooting.
Nor was an objection made when Shenika Russell ("Russell"), another witness to the shooting, testified about a comment made by Thomas. Russell stated that Thomas came up to Charles Smith who was still on the ground after the victim had beaten him up. It was her testimony that:
Chris Thomas came and he was like man, that was my fight. He say "do you want to smoke that n____r?" Charles said "yes"....
There was also no objection when Bonner was asked what statement Thomas made as they were driving away from the scene. The response was that Thomas said "I f____up."
Thomas' pre-trial motion for production contained the broad request to be informed of any statements he had made. Although three of these statements have erroneously been labeled as inculpatory statements, the record is clear that all but one of the statements were made before the commission of the crime.
The rules of discovery are intended to eliminate unwarranted prejudice arising from surprise testimony, to permit the defense to meet the state's case, and to allow proper assessment of the strength of its evidence in preparing a defense. However, the failure of the state to comply with discovery rules does not bring automatic reversal; rather, prejudice must be shown. State v. Harris, XXXX-XXXX (La.02/26/02), 812 So.2d 612.
This court is of the opinion that the state cannot hide behind its open discovery policy when the information sought is not placed in its file. The record shows the state learned of the statements made by King and Bonner during trial preparation. Whether or not the other two statements were known to the state before the witnesses testified is not shown. We find that the trial court erred by failing to rule that the state should have provided Thomas with the statements which it was aware of prior to the trial and by failing to take action to see that he was given this information before the trial continued as outlined in La. C. Cr. P. art. 729.5.
However, the ruling is subject to a harmless error review. The facts of this case are similar to those found in State v. Freeman, 447 So.2d 1145 (La.App. 3rd Cir.1984), writ denied, 449 So.2d 1356 (La.1984). In that case the defendant had requested notice under La. C. Cr. P. art. 716(B) and the state had supplied one inculpatory statement made to a police officer in response to the motion. At trial, three other state witnesses testified about statements the defendant made. The court found that although the state should have supplied the defense with these statements and that it was error on the part of the trial court to allow the statements into evidence, it was harmless error as it was found not to be prejudicial to the defendant.
In this case, Thomas' argument that he might have entered a guilty plea to *166 manslaughter had he been aware of these statements is purely speculative. The record shows that Thomas had been provided with a list of witnesses the state planned to call. He knew that several of these witnesses had been present when the shooting occurred. Furthermore, he opted to go to trial knowing that Williams had a clear view of the shooting of Collins and could testify about that fatal shooting. We find the trial court's error did not cause substantial prejudice to Thomas and thus conclude that this assignment lacks merit.
In the second assignment of error, Thomas contends the trial court erred in sustaining the state's objection to testimony regarding prior threats by the victim against Thomas after the evidence showed a hostile demonstration on the part of the victim. Specifically, Thomas argues that Collins' act of arming himself with two knives when he went to the door was a hostile act, and the trial court erred in ruling it was not. Further, Thomas argues that the trial court erred in not allowing his trial counsel to cross-examine the surviving victim regarding the "hostile character and threats made by the victim." Thus, Thomas had no way to establish his state of mind at the time of the incident and was thus denied the right to a fair trial.
Louisiana C.E. art. 404 provides in pertinent part:
* * *
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible.
The record shows the state objected when Thomas' trial counsel asked the victim's girlfriend, Williams, "Have you ever known Dondi Collins to be in trouble with anyone?" At the sidebar the defense argued that La. C.E. art. 404(B)(2) allowed evidence of the victim's dangerous character to be admitted since he had already shown "that Dondi Collins did make an overt act or hostile act." Williams had just testified that Collins had gone to the door with two knives. The state countered that since the victim was defending his home when he went to the door with the *167 knives, he was not the aggressor. The trial court ruled that there was no hostile act and sustained the objection. Thomas then proffered the following testimony from Williams: she knew he had prior convictions of possession of cocaine, possession of marijuana and illegal carrying of a weapon; she knew that he had been in fights on two or three occasions and one fight had been with Thomas' brother; and, he had used physical force with her recently.
Here, it appears that the proffered testimony added nothing to show "evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character," as required under La. C.E. art. 404(B)(2). The proffered testimony did not include any questions regarding prior incidents with Thomas or of any threats he had made to anyone. Testimony elicited before the objection had established that this witness knew of no prior arguments between Thomas and the victim prior to the day of this incident. Also, in testimony prior to the objection, Williams had testified that the victim had gone to the door armed with two knives and that she was trying to get him not to open the door.
Testimony before this point had shown that on the day of the incident the victim had heated confrontations with Thomas, Boyd, Tonya and Smith. He had used profanity with all of them and had called them names. He had also bested Smith in a fist fight after Smith had thrown a beer can at him. One of the state's witnesses, King, had testified that the victim was trying to change so that he would not get into trouble now that he was a father. Another state witness, Gilbert, testified that the victim had fought with others and that recently there had been a problem between Collins and Williams that caused the victim to go stay with his mother for a while.
We concur with the state's position that Smith was the aggressor when he went to Collins' door. The evidence clearly shows that Collins had retreated after the fight with Smith. Smith and the defendant then came to Collins' door and Smith kicked it open. The query is whether or not Thomas can now urge that the victim's response, coming to the door armed with knives, is either a hostile or overt act giving rise to the exception found in La. C.E. art. 404.
In the instant case, the evidence is clear that the victim came to the door with two knives. The investigators testified that knives were found by the body and Williams testified that Collins was rushing to the door with the knives. The jury knew this prior to the objection by the state that led to the proffered testimony. The only new information learned in the proffered evidence was the victim's criminal history and the number of fights Williams knew about.
Even without the proffered testimony, the jury in the case sub judice was aware of the victim's tendency toward aggression. The testimony clearly showed him to be a verbally abusive, hot-headed man. The jury was aware of his demeanor and reputation from the state's witnesses. The jury had already heard the testimony that the victim opened the door armed with two knives. The proffered testimony would not have added any relevant facts necessary for the jury to make its determination as to which man should be deemed the aggressor, whether the killing was in self-defense and necessary or what Thomas' state of mind was at the time he shot the victim. We find no merit to this assignment of error. See State v. Washington, 30,866 (La.App.2d Cir.08/19/98), 716 So.2d 936, writ denied, 1998-2473 (La.01/08/99), 734 So.2d 1229.
*168 Finally, Thomas maintains that the trial court failed to specify whether the sentences imposed were to run concurrently or consecutively, but merely stated "[T]he sentence to be imposed is in accord with the laws of the State of Louisiana and consistent with the sentencing guidelines."
On appeal, Thomas argues that since the trial court did not expressly order the sentences to be served consecutively, this court should find that they should run concurrently under the provisions of La. C. Cr. P. art. 883 which provides:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.
Thomas also argues that since the "trial court did not specifically state any particular reason why the sentences should run consecutively" they should be presumed to run concurrently. See State v. Matthews, 544 So.2d 629 (La.App. 3rd Cir.1989), writ denied, 550 So.2d 647 (La.1989).
The state agrees that it appears the trial court intended for these sentences to run concurrently. The record shows that after the trial court pronounced the lengths and terms of the two sentences, the defense counsel asked, "For verification, are those sentences to run concurrently?" The trial court responded, "[T]hey are in accord with law, whatever the Department of Public Safety and Corrections [sic]."
We agree with Thomas on this issue. Since these convictions arise from the same incident and the trial court did not expressly order and give reasons for the sentences to be served consecutively, the Department of Corrections will run these sentences concurrent to one another. While it is not necessary, we will clarify for the record that the sentences are to run concurrently.
Finally, our error patent review of the record reveals that Thomas was originally charged on June 4, 2002, by grand jury indictment with first-degree murder for the death of Dondi Collins and attempted first-degree murder of Demetrice Williams. He was later charged with second-degree murder by an "Amended Bill of Indictment (Bill of Information)" signed only by the district attorney on October 2, 2003. This document reduced the first-degree murder charge in connection with Dondi Collins to a second-degree murder charge and the attempted first-degree murder charge of Demetrice Williams to an attempted second-degree murder charge.
In State v. Hansbro, 35,027 (La.App.2d Cir.09/26/01), 796 So.2d 185, writ denied, 2001-2970 (La.10/25/02), 827 So.2d 1177, this court previously determined that while this is error patent, the appellant waived the error by not filing to quash the indictment. This court stated:
Louisiana C. Cr. P. art. 382(A) provides in part that a prosecution of an offense punishable by death or life imprisonment shall be instituted by grand jury indictment. Second degree murder is punishable by life imprisonment. La. R.S. 14:30.1(B). Therefore, the defendant's prosecution for second degree murder should have been instituted by a grand jury indictment. However, district attorneys are empowered to amend indictments to charge lesser offenses. *169 The state may abandon the charge of a greater crime and proceed with prosecution for the lessor crime and no formal indictment is necessary for that purpose. Thus, the district attorney had the power to amend the charge to second degree murder without a formal indictment.
In any event, the defendant did not file a pre-trial motion to quash based on this ground, as per La. C. Cr. P. art. 533(5). Thus, even though the lack of a "true bill" endorsement is an error patent, the error is waived due to the defendant's failure to file a motion to quash before trial. (Citations omitted)
So considering, we likewise conclude that Thomas has waived the error patent for failure to file a motion to quash the indictment.

CONCLUSION
For the foregoing reasons, defendant's convictions and sentences are affirmed. We amend the sentences and order that they be served concurrently.
AFFIRMED AND AMENDED.
NOTES
[1] This name is also spelled Demetritice Williams in the indictment.
[2] Note that this statement is referring to a statement made by Charles Smith, not by Chris Thomas, the defendant.